| | |
|---|---|
| WILL S., BY AND THROUGH ) <br> HIS PARENTS, D.S. AND K.S., ) <br> AND D.S. AND K.S., INDIVIDUALLY ) <br> ) <br> ) <br> PLAINTIFFS ) <br> ) NO. _____ <br> v. ) <br> ) <br> FRANKLIN SPECIAL SCHOOL DISTRICT, ) <br> ) <br> DEFENDANT ) <br> ) | |

# COMPLAINT

**COME THE PLAINTIFFS**, through counsel, filing this Complaint against the Franklin Special School District. They show:

## I. PARTIES, JURISDICTION, AND VENUE

1. Will S. is a minor student with a disability who resides with his parents, D.S. and K.S., his father and mother, respectively, in Franklin, Tennessee (Williamson County). D.S. and K.S. bring the matter too, to the extent that reimbursement of the $20,0000 spent on private educators and other costs and fees requires suit in their names.

2. Franklin Special School District (FSSD) is the local education agency ("LEA"). It receives federal funding and must provide special education to students who, like Will, are eligible under the IDEA.

1

3. This action arises under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400 *et seq.* Jurisdiction is conferred upon this Court by the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1415(i)(2)(A) and 1415(i)(3)(A), which provide district courts of the United States with jurisdiction over any action brought under the IDEA, without regard to the amount in controversy. The IDEA appeal is taken from the administrative Final Order.

4. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b), as Plaintiff resides within the boundaries of the Middle District of Tennessee and all events and omissions giving rise to this Complaint occurred in Williamson County, within this judicial district.

5. Administrative exhaustion occurred through a state due process hearing with a Final Order by an administrative law judge dated March 4, 2025. This appeal is therefore timely as it is brought within sixty (60) days of the Final Order. The appeal includes an action for reasonable attorneys' fees for the denial of FAPE. 20 U.S.C. §1415(i)(3)(B); 42 U.S.C. §1988. And it includes an appeal of the period and scope of FAPE denial, along with a request for additional confirming evidence.

## II. INTRODUCTION

6. The IDEA demands a "markedly more demanding" approach to FAPE than the *de minimis* standard which had allowed students to "[sit] idly ... awaiting the time when they were old enough to drop out."[1] This higher standard applies to students like Will who need not aim for

---

[1] *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 403 (2017).

"grade level advancement," but still receive an education that is "appropriately ambitious" for his circumstances.[2]

7. But what *is* appropriately ambitious for Will? That depends largely upon two factors: (A) how one's disability is viewed; and (B) use of peer-reviewed, research-based intervention programs (specially designed instruction), data collection, and analysis.

8. On the first, FSSD admittedly *views* Will as a "can't do" child from an old deficit-model approach to special education. Deficit mindsets view the learner based upon their *deficiencies* rather than upon the capabilities—their weaknesses, not strengths. Standardized test results can be a "scarlet number" for that negative view.

9. On the second, FSSD lacked a valid intervention or program accompanied by data collection and analysis. The first plagued the second—FSSD thought Will to be a "can't do" child, so that no special education intervention or program was actually being used with fidelity. At best, unsuccessful modifications to a general education program were tried and then shelved.

10. So, in the fall of 2023, with Will making woeful progress, the parents obtained outside educational help. These outside educators, a nearby former special education director, Lynn Cable, and special education teachers from neighboring Williamson County, created an "ambitious" program for Will's unique needs. Beginning in that fall semester of 2023 and continuing into the summer of 2024, they viewed Will *positively* and, with appropriate special education interventions along with thorough data collection and analysis, they proved his circumstances were so much more than what FSSD believed them to be.

---

[2] *Id.* at 402.

11. Educator feelings got hurt. There were "*two Wills*," FSSD implied, one that can learn at home, but one that cannot learn at school. But this Will who "cannot learn" is a figment from a deficit model of low expectations—*teacher perception*. In fact, at due process, FSSD hired an expert witness to advance the old deficit model of low expectations to explain this Will who "can't learn." When that expert described Will as a "can't do" child, and to just "keep him happy," Will's experts and educators countered with the positive model and exceptionally thorough data proving how FSSD's thinking was outdated. It is not accurate. He is a "can do" child.

12. There are *not* two Wills of course. There is one little boy named Will. And the notion that Will can perform so wildly differently with special educators using the same interventions and IEP goals at home, versus at school, is, again, a fiction. This was a *teaching* issue that became a turf issue for FSSD. As explained below, for years, FSSD failed to create an adequate program for Will's unique needs and, then, failed to implement the new programming adequately and with fidelity.

### III. FACTS

*Fall Semester of Second Grade*

13. Will is an IDEA-eligible student with an IEP. He has global delays and developmental disabilities due to chromosome micro-deletion (3q27.1-3). His educational disability is multiple disabilities, intellectual disability, and other health impairment.

14. Will's second-grade teacher at FSSD, Ms. Roberts, is a kind teacher who, just as plainly, views disability in an older model of deficit terms: what the student *can't* do.

15. A key example occurred in an October 19, 2023 IEP meeting, second grade, where Ms. Roberts was asked: "Do you have a reading curriculum for Will?," and she admitted saying, "*I don't because he hasn't been able to get that right.*"[3]

16. Instead of using scientifically-based and peer-reviewed *special education* interventions for Will, Ms. Roberts was trying, unsuccessfully for years, to modify a *general education program* known as "95% Group." Even at the kindergarten level, Roberts concluded this program was beyond Will's means because "he can't identify letters still,"[4] so she stopped using it.[5] Thus, for years, without appropriate interventions for his needs, Will received no access to general education standards for Math, English Language, Science and Social Studies.

17. Will's family undertook a systematic analysis of the 1:1 academic service hours on his IEP and compared that to Ms. Robert's actual class schedule.[6] It didn't match. And it wasn't even close. Will was missing out on *hundreds* of hours of special education, even removing times he arrived late, left early, or was absent.

18. Based on Ms. Roberts' class schedule, FSSD had failed to implement 282 hours of Will's IEP in kindergarten; 330 hours in first grade; and, in second grade, up to the due process hearing, 153 hours (through November 2023).[7] Removing all of Will's absences and tardies from the equation, the total loss for that period of time came to 610 hours.[8]

---

[3] TR 694; Ex. 28 (meeting recording).
[4] Ex. 28 (at 35:42)
[5] Ex. 28 (at 35:49)
[6] TR 26-27. Although they did not know it, this is a frequent special education issue—the IEP not matching the class schedule.
[7] Ex. 9.
[8] TR 37.

5

19. On October 30, 2023, FSSD administrators acknowledged the hours were not delivered, they could not find that Ms. Roberts was using appropriate interventions to afford Will access to general education standards, and compensatory services were in order.[9] So, with assistance from a former Tennessee special education director (Ms. Lynn Cable), and outside special education teachers, the IEP Team regrouped in the fall and through the spring semesters of 2024. As Ms. Cable explained, FSSD acknowledged their shortcomings in a raw fashion:

> It was mentioned several times in the second-grade school year that, yeah, we don't know about that teacher. It was casual. It was honest. It was raw. And we appreciate hearing that, you know, that okay, maybe there's a plan somewhere that we can work with, all the while going to the meetings, all the while working with providing information, then receiving it graciously as, I my opinion, as if we don't have anything better, we'll take Lynn's kind of attitude about things, yeah.[10]

*Spring Semester of Second Grade*

20. Helped by Cable and special education teachers from Williamson County, FSSD agreed to provide Will with a research based, peer reviewed curricula program designed for special needs students like Will. Chief among these was Early Literacy Skills Builder (ELSB), which began in late November of 2023.[11]

21. Ms. Roberts tried to implement the ELSB program in the second semester of second grade, spring 2024. But to Roberts, who had not used ELSB with Will, his "data was consistently inconsistent," even though she believed he did "make progress" on the ELSB program.[12]

---

[9] TR 40, 142.
[10] TR 143-144.
[11] TR 707.
[12] TR 707-708.

22. The ELSB program would continue through the summer of 2024 with the private teachers delivering it. This continuation of ELSB was important for consistency and progress. As Ms. Roberts explained: "And so in the hopes that he would continue to make progress, we had the same curriculum for him to take home for the summer, to continue that."[13]

*Summer After Second Grade*

23. For the summer, Will's parents retained the special education director and the special education teachers that had helped FSSD.

24. Hannah Rosen worked for four years as a teacher for students with severe disabilities in neighboring Williamson County. A graduate of Vanderbilt's Peabody College of Education, she was working on her own further education in the School of Education at Columbia University in New York. She had strong experience with using ELSB with students. She was *ideal*. And she was assisted by three other teachers that summer.

25. ELSB provides a very scripted program taking the teacher and student from basic into more complex reading skills—from basic pre-literacy to reading comprehension, written expression, and blending words.[14] Consisting of at least 7 levels, the student must achieve a score greater than 75% to move to the next level. In short, it can't be faked.

26. Ms. Rosen testified as an expert witness in special education. With ELSB, and the teachers' data on Will, she delivered a master-class in how *data* must be taken on IEP goals for a child with severe disabilities to understand the progress that can be made—i.e. "appropriate progress" for a child's circumstances. These data sheets, filed as a due process exhibit,[15] show the

---

[13] TR 708.
[14] TR 236.
[15] Exhibits 31 and 32.

service dates with Will, his IEP goals, corresponding pluses or minuses on everything Will attempted for each particular lesson of ELSB, and contained notations for when he was deliberately not trying or distracted.

27. As a result, Rosen and the other teachers could systematically *quantify* Will's progress, measure it, and back it with data under a program providing Will access to general education: the ELSB.

28. Nor were Rosen and the other beset with deficit-based views of the child. Unlike FSSD, Rosen's lens on progress and capability was not deficits-based, but that of Will being "a will-do and a can-do child," one with a "thirst to learn," one who "wants to know more, one who wants to understand." As she put it: "He is excited to learn."[16]

29. As Rosen prepared to return to graduate school, Bendet, a seven-year teacher at Williamson County, continued with Will. Bendet testified too. And with Rosen, Bendet, and the other two teachers, Will progressed through seven levels of ELSB.[17] He reached level 7 in October of 2024. In fact, Bendet included a video to illustrate how, even in January of 2025, Will retained mastery.[18] Like Rosen, she and the private teachers believed Will is a "can do" learner.

*Fall of Third Grade*

30. As Will returned for third grade, FSSD privately felt chapped or undermined both by the reveal of its own shortcomings and the clear progress Will had made with the private educators. The parents had rightfully raised the shortcomings, replicated the program and IEP goals at home, and showed tremendous progress through detailed data collection and analysis.

---

[16] TR 259.
[17] TR 300, 305.
[18] TR 295, 297.

31. For third grade, back at FSSD, FSSD assigned a new special education teacher, Ms. Kettler, for Will. The parents hoped Will would finally receive FAPE commensurate with his circumstances without all the negative attitudinal biases. However, Ms. Kettler did not even agree with using ELSB—the very special education intervention granting Will access to general education and upon which he had shown tremendous progress.[19] And culturally, like Ms. Roberts, Ms. Kettler viewed Will from a *can't do* perspective: "For example, the Number Worlds, the math curriculum, he doesn't have the prerequisite skills to implement the curriculum. It's a lot of counting with one-to-one correspondence, sorting."[20]

32. Also like Ms. Roberts, Ms. Kettler's data on Will's progress showed him "very, very inconsistent. You know, you might have one data collection time where it's 20, and then the next time might be 60, and then it could be 40, and then it could be zero."[21] She did not allow for how this reflected a teacher issue, not a learner issue. Ms. Kettler put Will on Level 2 and then Level 3 of the ELSB where he remained there for months.[22]

33. The parents asked for the school to collaborate with the private teachers on ELSB and IEP goals success at home. However, FSSD administration gave Ms. Kettler a "directive" otherwise: "I was told to not communicate" with them.[23] And that directive would remain in place all the way from the fall of 2024 and through the January 2025 due process hearing.[24] This left in place the fiction of the "two Wills."

---

[19] TR 737, 761.
[20] TR 737.
[21] TR 742, 767 ("[Will] is very inconsistent with his progress.")
[22] TR 768.
[23] TR 756, 780 ("I am to do what I am told.").
[24] TR 782.

9

34. At the hearing, the competing battle line of Will as two persons was drawn—the "can do Will" at home and the "can't do Will" at school—same learner, same IEP, same special education intervention program. And true to that format, the parties presented expert testimony on the two Wills.

*FSSD's "Can't Do" Expert Witness*

35. FSSD's expert at due process was Dr. John McCook, formally educated in the 1970s. He's never taught special education and he doesn't have a special education degree. But long ago, he helped create segregate classrooms and even the "Fort Sanders Development Center" in Knoxville. He calls them "12-month children," those children who were said to need year-round education ("12 months").[25]

36. Although he did not observe Will directly, or speak to Will's parents, or to the private teachers, or to Ms. Cable, Dr. McCook viewed Will as a *can't do child* because he could not perform grade-level work: "In terms of his ability to perform third grade work, he's a can't do child. He can't perform third grade level work at this point."

37. Nobody ever said Will could do (or should do) grade level work. But to Dr. McCook, *that* meant he should receive only a "functional" education with independence as the goal.[26] And were FSSD *not* to use that very low approach, despite it being inconsistent with Tennessee law and Will's abilities, FSSD will do Will a "disservice."[27]

38. With that deficit-lens marked by whether grade level achievement was reachable, Dr. McCook's yardstick for progress is also exceedingly low. Again, he testified: "And our role

---

[25] TR 807.
[26] TR 813.
[27] TR 815.

should be to make W.S. – number 1, *keep him happy*. Keep him happy in terms of what he does and let him experience success but make him as independent as he can be. Not giving up on W.S., it's just a different focus of where to go with W.S."[28] To him, parents "hir[ing] a pitching coach for a child who's never going to pitch" is a waste of time.[29]

*Will's Can-Do Expert Witness*

39. Will's family retained the retired special education director from Lebanon, Tennessee, Ms. Lynn Cable, who assisted Metro Nashville Public Schools with IEP monitoring.[30] Ms. Cable was involved with FSSD, attended up to fifteen IEP meetings for Will, observed him in class for both Ms. Roberts and Ms. Kettler, and assisted in fixing the IEP and getting the intervention-based program in place (the ELSB). And she ensured a replication of the program and work on the same IEP goals at home.

40. Ms. Cable is keenly aware of the low-thinking of Dr. McCook's day, as she had a sister institutionalized prior to the passage of the IDEA.[31] And being both a special education teacher and director, she long ago rejected the deficit-model of thinking. As she says of Will: "He is curious. He is personable. He's articulate. He has an amazing auditory memory ability. He's engaging. And upon my first visit with the family meeting, I looked at them and said, "[Will] is a learner. And I know they teared up, because that's what I believe."[32]

---

[28] TR 816.
[29] TR 827. Notably, this unambitious attitude, fostering a learned helplessness, was met with this exchange from Will's due process lawyer (Jack Robinson): "Can I tell you that you're the reason why I got into special education to begin with, to fight against attitudes like yours with regard to children with disabilities like W.S." TR 842.
[30] TR 119.
[31] TR 114.
[32] TR 120-121.

41.     To be sure, Cable explained, Ms. Roberts loved and adored Will. But one cannot simply love a child enough to get them to learn.[33] Rather, one must first *believe* they are a learner and then "use our data to inform instruction."[34] Deficits matter, but giving up on the special education interventions to access general education standards is not an option. Will must be exposed to core standards in Tennessee—science, social studies, reading and math—not just "keep him happy and independent."[35] Having reviewed the IEPs, the data, sat in on the classroom, and met with Will, FSSD was not taking that step for Will. "[B]ecause he was seen as he can't, he's not a learner."[36]

42.     Plainly, Cable could see the issue was a teaching problem, not a learner problem. But having been a special education teacher, a director even, she addressed the FSSD teacher's shortcomings diplomatically:

> I want to be sensitive to the teachers involved here, having been a teacher. You know, education is hard. We know it's real hard. But I believe that the tutors [the private teachers from Williamson County] hold an appropriate high expectation for W.S. as a learner. I believe they hold an appropriate expectation that he will sit and tend to his learning and instruction, as compared to the school setting with Ms. Roberts, who loved him to death. And I've seen this in my entire career, these teachers that are just wonderful human beings, but can't teach, can't teach and get progress, right?[37]

43.     When it comes to a FAPE, with a rigor appropriate for Will, Cable opined:

> The district deprived him of an education of any sort, let alone letters and standards and words. They deprived him of an opportunity to go to school every day thinking he's going to bring home something new to tell mom and dad, in his limited way. They deprived him of meaningful benefit and opportunity to be with nondisabled peers, even in the bathroom. They deprived him of an expectation that he could

---

[33] TR 126.
[34] TR 127.
[35] TR 129.
[36] TR 130.
[37] TR 156.

learn something. Yes, he was deprived of a free and appropriate and equitable public education.[38]

*The Hearing Officer Decision and Errors*

44. On March 4, 2025, the Administrative Law Judge issued a Final Order.

45. First, the ALJ mistakenly believed the statute barred any claim before July 29, 2022, limiting the period of consideration to two years back from the date of filing the due process complaint. However, it was not disputed that Will's parents did not discover the failure to deliver the service hours until the fall of 2023. Accordingly, using the IDEA's discovery rule, the time period of the ALJ is incorrect.

46. Second, the Final Order determined that FSSD did deny Will a FAPE from November 3, 2022 to November 3, 2023. Thus, Will is a prevailing party for purposes of statutory recovery of attorneys' fees. However, the ALJ said the denial comprised "664 minutes," creating a remedy from an submission FSSD had made to TDOE about missing service hours. This is woefully deficient for the actual calculation of service hours missed and the FAPE denial itself. The ALJ's calculation for the denial of FAPE is wrong for each applicable year, such that the extent of the remedy for FAPE denial must be corrected too.

47. Third, the ALJ determined that Will's IEP was written and implemented correctly. Both are incorrect. Even Ms. Roberts' testimony and the IEP meeting evidence of her statements showed she was *not* using an appropriate special education intervention (scientifically based, researched, and peer reviewed) for Will.

---

[38] TR 160.

48. The ALJ adopted the theory of the "two Wills," chalking up his abilities at home as being vastly *different* from school, as if that would account for Will's wildly different progress. It cannot possibly be that Will is such two different children simultaneously. The ALJ buried a footnote—belied by the evidence including the ELSB standards and data—that their "truthfulness is not questioned, but their *motivation* to have a client succeed in private tutoring, and early in their careers, could have affected their assessment of W.S.'s mastery of the curriculum." To the contrary, the assessment of mastery cannot be faked—or changed by teacher motivation.

49. In the world of special education, what is "appropriate" progress turns on the child's circumstances. So the key indicator is specialized intervention, or programs, along with data collection and analysis when working on the IEP goals. Performance data doesn't lie. And it ensures Will does not suffer from a bar too low, where "merely more than de minimis" progress is considered "appropriate," as the ALJ did here. *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 402-403 (2017).

50. Data collection and analysis on an appropriate intervention program are what permit the "cogent and responsive explanations" required by *Endrew F.* and any deference owed to the educator's judgment. Without the appropriate program, and good data, FSSD viewed Will as a "can't do child," as if to be loved and "kept happy," with more functional goals, instead of providing him a rigorous education for *his circumstances*.

51. Without good data on valid interventions, if you believe a child can't do things, or you believe he can do things, you'd be right. It's just a highly subjective, data-less opinion.

52. And in this case, while the ALJ found a denial of FAPE for a certain period, the ALJ ignored the overwhelming data and testimony in the scope of denial and remedy. Accordingly, this

14

appeal is filed with request for appropriate relief including appropriate compensatory education, reimbursement of educational costs (the teachers were approximately $20,000), and for the fees associated with the underlying due process and this proceeding.

**Request For Additional Evidence**

53. Plaintiff also moves to submit additional evidence. The ALJ failed to address the admissions from FSSD that were recounted by the parents and Ms. Cable in their examinations. Additional admissions come from an October 30, 2023 meeting where the service hours and deficiencies in special education programming were all acknowledged by FSSD.

54. Perhaps the ALJ viewed witness testimony as second-hand accounts, or may not have realized the admission by party opponent, or may not have viewed the testimony as "best evidence." Regardless, the admissions were not addressed, and must be, and Plaintiff seeks to admit, or at the appropriate time will seek to admit, the audio recording of the October 30, 2023 meeting.

55. This recording shows, *inter alia*, the special education supervisor for FSSD (Dr. Robey) agreeing that Ms. Roberts could not even identify an actual curriculum in the last IEP meeting:

> The question kept being imposed, you know, what was the curriculum, what curriculum was being used, and there was no specific response, um there were responses regarding what had been tried and what might not have been successful. But as far as what was currently being used and what is continuously being used to fidelity, that was never identified.[39]

56. It also shows, as the family explained, how the minutes did not match the IEP. Again, Dr. Robey: "I when I went back through the schedule as well, I was unable to find a lot of

---
[39] October 23, 2023 Recording at 5:44.

the minutes."[40] "So identifying those 210 minutes, you're right. In looking at her schedule, I could not identify those 210 minutes."[41] And how the differential between the IEP and what was being provided "is massive."[42]

57. The recording also confirms, as Ms. Cable said, that FSSD was open and honest about the shortcomings in their meetings in the fall of 2023, apologetic even, with the Vice Principal of the school, Ms. Larkin, stating:

> And so my sincere apologies that you've had to come to us with this many problems. And but I hope that our actions will speak louder than our words and that we're able to get some things turned around and accomplished, and that we set Will on a on a path for success. So that you're not meeting with so much frustration because I can't imagine from the parent standpoint how infuriating that has to be.[43]

58. Additionally, evidence of Ms. Kettler ignoring the IEP (after the Amended Complaint and the exhibit exchange deadlines) confirms a gross failure to implement the IEP. Petitioner anticipates moving to enter this evidence at the appropriate time too.

## IV. LEGAL CLAIMS

### Violations of the IDEA

59. First, having been declared the prevailing party for a denial of FAPE, and receiving a remedy of compensatory education, Plaintiffs request their attorneys' fees and reasonable expenses. That includes the due process and this action pursuant to the IDEA. 34 C.F.R. §300.517; 20 U.S.C. § 1415(i)(3).

---

[40] *Id.* at :44
[41] *Id.* at :1:06:13.
[42] *Id.* at 1:07:45
[43] Id. at 1:23:41.

60. Second, an appeal is made on the scope of the FAPE denial, both the number of years, and the number of hours each year. That is, FSSD teaching staff denied FAPE to Will under the IEPs from kindergarten through the fall of 2023 by (A) failing to deliver his IEP academic direct service minutes and (B) failing to utilize an appropriate special education interventions upon which he could make progress. This was not a matter of hundreds of minutes but hundreds of *hours*.

61. Third, even once the IEP was changed and special education curricula added in the fall of 2023, it still was not implemented correctly by personnel at FSSD in second and third grades. In fact, Ms. Kettler's disbelief in the special education intervention and in Will's capabilities led to him being ignored. This too denied him an "appropriate" education for his circumstances (FAPE), as Will fell sharply.

62. An appropriate remedy for the denial of FAPE must be given. While the private teachers made up ground, this was far too little, far too late. And it came at a financial cost to the family of approximately $20,000, for which they must seek reimbursement.

63. In summary, Will and the family must seek reimbursement, additional compensatory education (including an appropriate fund to be used for education), and all attorneys' fees and costs.

64. Fourth, as requested, submission of the additional evidence is sought or will be sought.

**WHEREFORE, PREMISES CONSIDERED, PLAINTIFFS** pray that Defendant Answers this Complaint, and for all legal and equitable relief set forth herein, along with any further relief appropriate to this cause.

Respectfully submitted,

**GILBERT LAW, PLC**

s/Justin S. Gilbert
Justin S. Gilbert (No. 017079)
100 W. MLK Blvd Suite 501
423.756.8203
Chattanooga, TN 37402
justin@schoolandworklaw.com

**BRAUN LAW**

s/ Michael F. Braun
Michael F. Braun (No. 032669)
5016 Centennial Blvd, Ste. 200
Nashville, TN 37209
(615) 378-8942
mfb@braun-law.com

18

Case 3:25-cv-00497     Document 1     Filed 05/01/25     Page 18 of 18 PageID #: 18